MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2015 ME 30
Docket:        Yor-13-578
Argued:        November 5, 2014
Decided:       March 17, 2015

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, and HJELM, JJ.[*]

## STATE OF MAINE

v.

## JERRY LEE ADAMS

HJELM, J.

[¶1]   Jerry Lee Adams appeals from a judgment convicting him of aggravated trafficking of scheduled drugs (Class A), 17-A M.R.S. § 1105-A(1)(B) (2014), and refusal to submit to arrest or detention (Class E), 17-A M.R.S. § 751-B(1)(A) (2014), entered in the Superior Court (York County, *O'Neil, J.*) after a jury trial.   Adams argues that the court erred by sustaining the State's objection to questions about the nature of the locale where the crime allegedly occurred.   He also argues that the court erred when it denied his motion for a judgment of acquittal.   We affirm the judgment.

## I. BACKGROUND

[¶2]   The record, when viewed in the light most favorable to the jury's verdict, supports the following facts.   *See State v. Cruthirds*, 2014 ME 86, ¶ 2,

---

[*]   Silver, J., sat at oral argument and participated in the initial conference but retired before this opinion was adopted.

2

96 A.3d 80. On the night of January 2, 2013, Saco Police Officer Heath Mains stopped a vehicle on Jeannette Avenue in Old Orchard Beach and informed the driver that he would be searching her and the vehicle. Adams was a passenger in the backseat of the car. When Mains returned to his car to call for backup for the search, he saw Adams and a second passenger exit the vehicle. He ordered them back into the car, but Adams fled behind a nearby condominium building. Mains observed that Adams was wearing a large black down jacket, but did not see him holding anything when he fled. Mains stayed with the car until additional officers arrived and then showed them the direction in which Adams ran.

[¶3] One of those officers, Matthew Corbin, went to look for Adams behind the condominium complex and found him crouched against the building. As Corbin approached, Adams ran away from him in the direction of Mains and the stopped vehicle. When Mains saw Adams running with Corbin in pursuit, he tackled Adams, and both officers were able to handcuff Adams after a struggle. At that point, Officer Scott Sicard arrived to help Mains and Corbin. He asked Adams why he ran, and Adams replied that it was because the driver of the vehicle had bail conditions. Corbin also later asked Adams why he ran, and "he said something to the effect it's because I'm black."

[¶4] Another officer, Daniel Beaulieu, conducted a pat-down search of Adams and found a leather pouch, which Beaulieu recognized as the type

commonly used to hold a digital scale. Beaulieu then went back to search behind the condominium building because Mains believed that Adams may have dropped or hidden something there. Beaulieu noticed footprints in a snow bank along a nearby fence and then saw a nylon strap hanging on the fence. The strap was part of a small backpack, which Beaulieu seized. It had snowed several days earlier and remained very cold, but, Beaulieu testified, the footprints leading to the backpack "looked fresh." The backpack did not have any snow or frost on it, but Beaulieu could not remember whether it was cold to the touch. When Beaulieu returned with the backpack, Mains asked Adams, who was being treated for injuries he had sustained in his struggle with the police, what he wanted them to do with his backpack. Adams responded, "What backpack?"

[¶5] Upon searching the backpack, the officers found twenty-eight small bags containing a white substance, a scale, a box of plastic sandwich bags, a magazine addressed to someone other than Adams, DVDs, and a cell phone. The scale had a plastic cover, but it also fit inside the pouch that Beaulieu found in Adams's pocket. Laboratory tests later confirmed that the bags contained 29.8 grams of cocaine base, also known as crack cocaine. No other forensic testing was performed on any of the items in the backpack.

[¶6] Several days later, a resident of one of the condominiums called the police and reported that she had found a black down jacket hidden in her backyard.

4

Upon searching the jacket, which matched the description of the one worn by Adams, the police found two cell phones. There was no investigation into the ownership of the cell phones or search of the cell phones' contents.

[¶7] Adams was charged by indictment with two counts of aggravated trafficking of scheduled drugs (Class A), 17-A M.R.S. §§ 1105-A(1)(B), (D), and by complaint with one count of refusal to submit to arrest or detention (Class E), 17-A M.R.S. § 751-B(1)(A). The State dismissed one of the drug charges, and the two remaining charges were tried together in a two-day jury trial in August 2013.

[¶8] At trial, Adams elicited testimony from Maine Drug Enforcement Agent Kyle Moody that he was "very familiar" with the neighborhood, known as the Halfway area, where Adams was arrested. Moody testified that it is a busy area with hundreds of residents and that at least some of them live there year round. Adams then started to examine Moody about prior investigations he had conducted in that area, but the State objected. At a sidebar conference, Adams's attorney explained that he wanted to prove that this was "a high crime area" in order to cast doubt on Adams's ownership of the backpack, noting that there had been "over fifty" indictments for drug offenses in Old Orchard Beach in the past year. The court denied his request to continue that line of questioning, concluding that the testimony would be impermissibly speculative alternative suspect evidence pursuant to *State v. Dechaine*, 572 A.2d 130, 133-34 (Me. 1990).

[¶9]  The jury found Adams guilty of both charges.  Adams had stipulated that he was previously convicted of drug trafficking in Massachusetts, so he was convicted of aggravated trafficking of scheduled drugs.  *See* 17-A M.R.S. §1105-A(1)(B).  The court imposed a sentence on the drug trafficking charge of twelve years in prison with all but six years suspended and four years of probation, and on the charge of refusal to submit to arrest or detention, it imposed a concurrent six-month prison sentence.[1]  Adams appeals from the judgment of conviction for aggravated trafficking.[2]

## II.  DISCUSSION

[¶10]  Adams argues that the court erred when it sustained the State's objection to his cross-examination of Moody about the "high crime" character of the Halfway neighborhood.  He also contends that the evidence is insufficient to support the jury's guilty verdict and that therefore the court erred in denying his motion for a judgment of acquittal.

A.    Cross-Examination of Moody

[¶11]  We first consider Adams's argument that the court erroneously ruled that he could not develop testimony through Moody that the area where the backpack was found was a high-crime area where drug trafficking was common.

---

[1]  We denied Adams's petition for review of sentence.  *See* 15 M.R.S. § 2151 (2014); M.R. App. P. 20.

[2]  Adams's arguments on appeal do not apply to the conviction for refusal to submit to arrest or detention.

6

We review the trial court's decision to exclude evidence for an abuse of discretion, and its "determination of relevance for clear error." *State v. Mooney*, 2012 ME 69, ¶¶ 9, 11, 43 A.3d 972.

[¶12]  During Adams's cross-examination of Moody, he asked Moody whether he had conducted investigations in the Halfway neighborhood, an area with which Moody stated he was familiar.  After the State objected to the question, the court conferred with counsel at sidebar.  There, Adams said, "I'm saying this is a high crime area. . . .  There ha[ve] been over 50 indictments in Old Orchard Beach alone on drug charges within the past year."  That was the extent of Adams's offer of proof on the testimony he hoped to elicit from Moody.  The court then drew on case law addressing the admissibility of alternative suspect evidence, referring specifically to *Dechaine*, 572 A.2d 130 (Me. 1990), and concluded,

> [T]here needs to be much more than just a generic assumption that this was a high crime area or that there were other drug dealers in the area.  I mean, you have got to specifically identify somebody. . . .  But to suggest that it is somebody else, it needs to be much more than just it's a high crime area and there [are] other potential suspects in the area.  We need to come up with somebody specific.

[¶13]  The court's ruling was predicated on two different considerations. First, it referred to precedent governing the admissibility of alternative suspect evidence.  We have held that a defendant may present "evidence that someone else may have committed the crime if that evidence has probative value sufficient to

raise a reasonable doubt about the defendant's culpability." *State v. Mitchell*, 2010 ME 73, ¶ 26, 4 A.3d 478. In invoking the analysis applicable to alternative suspect evidence, the court misapprehended the purpose of Adams's proposed examination. Even from his brief offer of proof, it is clear that Adams did not seek to present the evidence to show that some other particular person left the backpack containing cocaine on the fence. Rather, the apparent purpose of the evidence was to demonstrate more generally that, because this was a "high crime" area, a backpack containing crack cocaine was not out of place and was possibly left there by someone in the neighborhood, thereby providing the jury with an explanation for the backpack aside from Adams's alleged conduct. It was therefore incorrect for the court to state that Adams must "specifically identify somebody" in order for the evidence to be admissible.

[¶14] The second basis for the court's ruling, however, was relevance. In considering Adams's offer of proof, the court noted the speculative nature of the prospective evidence, stating that "it needs to be much more than just it's a high crime area and there [are] other potential suspects in the area." Although our opinion in *Dechaine,* which the court cited, examines the admissibility of alternative suspect evidence, it ultimately focuses on the basic principle of relevance. 572 A.2d at 134. The principle that alternative suspect evidence must have "sufficient probative value to raise a reasonable doubt as to the defendant's

8

culpability," *id.* at 134, is merely an application of M.R. Evid. 402, which provides that "[e]vidence which is not relevant is not admissible." *See id.* (citing M.R. Evid. 402). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M.R. Evid. 401.[3]

[¶15] Here, as in *Dechaine*, the proffered evidence was too speculative to meet the test of Rule 401, and the court did not commit clear error when it concluded, based on Adams's limited offer of proof, that the evidence of drug crimes in Old Orchard Beach was not relevant. *See State v. Mills*, 2006 ME 134, ¶ 15, 910 A.2d 1053. Adams initially stated that the prospective evidence would show that the Halfway neighborhood was a "high crime area," but when the State expressed uncertainty about whether Moody would say that, Adams offered that within the previous year, there had been fifty indictments for drug-related crimes in Old Orchard Beach. Even if Adams had been able to develop that testimony from Moody,[4] the court did not err in concluding that the evidence did not have

---

[3] The restyled Maine Rules of Evidence, now in effect, contain amended but similar language that does not affect the meaning of the rules. *See* M.R. Evid. 401-402 (restyled Rules).

[4] Adams's offer of proof did not demonstrate that Moody would have been able to present this testimony. The offer of proof was not framed in terms of Moody's prospective testimony, and Adams did not request an opportunity to conduct a voir dire examination of Moody to establish whether he would have been able to testify as Adams described at sidebar. Even when a trial court curtails cross-examination, the cross-examining party must demonstrate that the prospective evidence would be admissible, which includes a showing that the witness is competent to testify about the matter. *See* *State v. Mahaney*, 437 A.2d 613, 615-16 (Me. 1981). Here, Adams's offer of proof does not indicate that

sufficient probative value to support its admission for at least two reasons. First, indictments are not proof that crimes were committed. *See State v. Calor*, 585 A.2d 1385, 1388 (Me. 1991). Adams's theory of relevance was that drug-related crimes were frequently committed in the Halfway area, but he did not offer any evidence that such crimes were actually committed, only that people were charged with them. Second, the charges in the indictments were based on allegations of crimes committed in the entire municipality of Old Orchard Beach, not merely in the Halfway area, and thus are not probative of the level of crime where the backpack was found.

[¶16] Because of these weaknesses in the probative value of the evidence described by Adams in his offer of proof, the court did not err when it concluded that this evidence was too attenuated to warrant its consideration by the jury and that it did not have sufficient probative value to raise a reasonable doubt about Adams's guilt. *See* M.R. Evid. 401-402.

[¶17] Adams also contends that the court's exclusion of the "high crime area" evidence deprived him of a meaningful opportunity to present a defense, as

---

Moody would have been able to testify based on personal knowledge about the number of indictments for drug-related offenses in Old Orchard Beach over the previous year. Rather, the only relevant point shown or described to be within his personal knowledge was his familiarity with the Halfway area—a point developed during an earlier part of Moody's testimony. Although the court did not address the issue, Adams's failure to articulate the evidentiary foundation for the prospective evidence is an independent reason why the court did not err in sustaining the State's objection during cross-examination. *See Deutsche Bank Nat. Trust Co. v. Wilk*, 2013 ME 79, ¶ 19, 76 A.3d 363 (stating that "we may affirm a trial court's judgment on a ground not relied upon by the trial court" (quotation marks omitted)).

guaranteed in the Constitution. *See Cruthirds*, 2014 ME 86, ¶ 21, 96 A.3d 80; *Mitchell*, 2010 ME 73, ¶ 31, 4 A.3d 478 ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." (Quotation marks omitted.)).

[¶18]  We have recognized that the constitutional right to present a complete defense may, in some instances, be broader than what is allowed by the applicable rules of evidence.  *See Mitchell*, 2010 ME 73, ¶ 32, 4 A.3d 478 (citing *Holmes v. South Carolina*, 547 U.S. 319, 324-26 (2006)).  Nonetheless, the meaningful opportunity afforded to a defendant to present a complete defense is not offended when the trial court reasonably excludes marginally relevant evidence that the defendant contends is exculpatory.  *See id.* ¶ 33.  In those instances, the trial court's decision constitutes reasonable and constitutionally permissible regulation of the evidence in order to "focus[] the trial on the central issues by excluding evidence that has only a weak logical connection to the central issues." *Id.* (citing *Holmes*, 547 U.S. at 330).  Here, the court's evidentiary ruling embodied the reasonable judgments permitted by *Mitchell* and *Holmes* and did not violate Adams's constitutional rights.

B.    Motion for Judgment of Acquittal

[¶19]  Adams next argues that the court erred when it denied his motion for a judgment of acquittal.  "We review the denial of a motion for judgment of acquittal by viewing the evidence in the light most favorable to the State to determine whether a jury could rationally have found each element of the crime proven beyond a reasonable doubt."  *State v. Waterman*, 2010 ME 45, ¶ 29, 995 A.2d 243.  Adams contends that the evidence is not sufficient to support the jury's guilty verdict on the charge of aggravated trafficking in scheduled drugs, because, he asserts, the evidence does not connect him to the backpack that contained cocaine base.  *See* 17-A M.R.S. § 1103(3)(B) (2014) (describing the permissible inference of trafficking that arises pursuant to M.R. Evid. 303 when there is proof that a person "intentionally or knowingly possesses" more than four grams of crack cocaine).

[¶20]  Although there is no direct evidence that Adams possessed the drugs, "[c]ircumstantial evidence is no less conclusive than direct evidence in supporting a criminal conviction."  *State v. Woo*, 2007 ME 151, ¶ 5, 938 A.2d 13 (alterations omitted) (quotation marks omitted).  Here, circumstantial evidence that Adams possessed the backpack entitled the jury to conclude beyond a reasonable doubt that he was guilty of drug trafficking.

12

[¶21]  First, Adams fled from the vehicle upon learning that it was going to be searched.  *See State v. Hassan*, 2013 ME 98, ¶ 21, 82 A.3d 86 (stating that "evidence of a defendant's effort to avoid arrest can demonstrate a consciousness of guilt").  There was no warrant for Adams's arrest, and he did not give any other credible explanation for why he feared being searched.  Moreover, the officer said that he would be searching the vehicle and the driver, not the passengers, so the jury could have inferred that Adams feared that the officer would find something that was not concealed on his person, but rather in a container like the backpack in the car.  While no one saw Adams carrying anything when he fled, the officers' testimony established that his jacket was large enough to conceal the small backpack, and the jury could have reasonably believed that he was holding the backpack under his jacket when he ran.

[¶22]  Second, there was evidence that the backpack had been placed on the fence recently.  Officer Beaulieu testified that the footprints by the fence looked "fresh" and that the backpack did not have any snow or frost on it.  Since it was a cold winter night in Old Orchard Beach, it was reasonable for a jury to conclude that no one else would have recently placed the backpack there.

[¶23]  Finally, there was evidence connecting Adams with the backpack.  He had a pouch in his pocket of the type usually used to hold digital scales, and the

digital scale in the backpack fit inside it. He was also found hiding near where the backpack was found.

[¶24] This evidence, when viewed in the light most favorable to the State, is sufficient to support a jury finding beyond a reasonable doubt that Adams was the owner of the backpack, and that he was therefore guilty of trafficking the crack cocaine found in the backpack pursuant to the inference in 17-A M.R.S. § 1103(3)(B). *See State v. Lambert*, 363 A.2d 707, 710-11 (Me. 1976).

The entry is:

Judgment affirmed.

---

**On the briefs:**

Jamesa J. Drake, Esq., Drake Law, LLC, Auburn, for appellant Jerry Lee Adams

Janet T. Mills, Attorney General, and Jamie R. Guerrette, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State of Maine

**At oral argument:**

Jamesa J. Drake, Esq., for appellant Jerry Lee Adams

Jamie R. Guerrette, Asst. Atty. Gen., for appellee State of Maine